UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| TEENA HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PIEDMONT SENIOR LIVING | ) | |
| OPERATIONS, LLC, | ) | Civil Action No. 3:21-CV-__33____ |
| a Virginia limited liability company, | ) | |
| d/b/a The Lodge At Old Trail, | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT
(Jury Trial Demanded)

The Plaintiff, Teena Hall ("Hall" or "Plaintiff"), by counsel, complaining of the

Defendant, Piedmont Senior Living Operations, LLC, d/b/a The Lodge At Old Trail

("Defendant" or "Piedmont"), a Virginia limited liability company, alleges and says:

NATURE OF THE ACTION

1.      Plaintiff is a registered nurse and a Licensed Assisted Living Facility

Administrator.  She began her employment with Defendant on July 2, 2012 and worked

with distinction throughout her employment.  Plaintiff brings this action for legal and

equitable relief to correct and remedy her long-time former employer's unlawful and

discriminatory employment practices, including through the termination of her

employment and replacement with Plaintiff's former subordinate who is decades younger.

Plaintiff brings this action to make her whole and compensate her for her employer's

violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621,

*et seq.* (the "ADEA"), the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §12101, *et seq.* (the "ADA"), Virginia Code Ann. § 40.1-27.3, and Virginia common law of tortious wrongful discharge in violation of public policy.  Defendant also engaged in intersectional discrimination based on age and/or disability discrimination and/or retaliation in violation of the ADEA and/or the ADA.

<u>JURISDICTION AND VENUE</u>

2.     Jurisdiction is founded in this case upon 28 U.S.C. §§ 1331, 1343, and 29 U.S.C. § 626(c)(1).  The demand for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction over the Virginia state law claims pursuant to 28 U.S.C. § 1367.

3.     Plaintiff's employment responsibilities included work on behalf of Defendant within this District and Division, the employment records concerning Plaintiff are maintained in this District and Division, and venue is proper within this District and Division pursuant to 28 U.S.C. § 1391(b) and (c).

<u>ADMINISTRATIVE PROCEEDINGS</u>

4.     Plaintiff timely filed a Charge of Discrimination on March 16, 2021 with the Equal Employment Opportunity Commission (EEOC).  The Charge was cross-filed with the Virginia's Fair Employment Practices office, the Attorney General's Office of Civil Rights.  The Charge included discrimination and retaliation complained of herein under federal statutes and notice of the Charge was given to Defendant by the EEOC on March 31, 2021.  A true copy of the Charge is attached hereto marked Exhibit 1.  The EEOC issued a Dismissal and Notice of Rights letter dated May 28, 2021 informing Plaintiff that she had 90 days from her receipt of the letter within which to file suit.

5.      Plaintiff received the Notice of Rights letter on or after May 28, 2021 and has initiated this action within 90 days of the date that she received the letter.

6.      All administrative conditions precedent to the filing of this lawsuit have been performed or have occurred.

PARTIES

7.      Plaintiff is a 55-year-old female citizen of the United States and resident of Augusta County, Virginia.  At the time of the illegal termination of Plaintiff's employment with Defendant complained of in this action, Plaintiff was 55 years old.

8.      Plaintiff was an employee of Defendant within the meaning of 29 U.S.C. § 630(f) and 42 U.S.C. § 12111(4).

9.      Defendant is a Virginia limited liability company with its principal office located at 330 Claremont Lane, Crozet, Virginia.  Defendant is engaged in the business of offering private pay independent living, assisted living, and memory care residences and care at its facility, The Lodge at Old Trail ("the Lodge"), in Crozet, Virginia.

10.      At all relevant times, Defendant was an employer engaged in an industry affecting commerce with more than 100 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

11.      At all times relevant to the matters alleged herein, Defendant's agents and employees were acting during the course and within the scope of their employment or agency and with the knowledge and consent of Defendant.

FACTS

12.      Plaintiff began working for Defendant at its facility, the Lodge, in Crozet, Albemarle County, Virginia in 2012 as Health and Wellness Director.  Plaintiff was charged with oversight of a nursing team, and her position then became known as Director of Nursing, which position she occupied for at least 8 years until the unlawful termination

of her employment by Defendant.  Plaintiff's name badge at the time of the illegal termination of her employment reflected her position and title of Director of Nursing.

13.     The Defendant's website identified a Registered Nurse as the Director of Nursing during the timeframe when Plaintiff was the only Registered Nurse employed by Defendant, including the times relevant to this action.

14.     Throughout her employment with Defendant, Plaintiff met or exceeded Defendant's legitimate expectations, and she received positive performance reviews.

15.     Plaintiff never received discipline for performance reasons; nor had she received a written warning for performance reasons.

16.     Plaintiff was rewarded for her job performance with bonuses on an annual basis.

17.     As an example, at the performance evaluation in 2020 which preceded the unlawful termination described herein, Plaintiff received a performance rating that entitled her to a 4% pay increase, the highest increase available to employees.

18.     During Plaintiff's employment with Defendant, Defendant received deficiency free surveys or inspections by the Virginia Department of Social Services for approximately the last five years of her employment due in large part to Plaintiff's performance and leadership in her job.

19.     Plaintiff established and maintained an excellent working relationship with the Virginia Department of Social Services inspectors, the first two Executive Directors she worked with at the Lodge, the Medical Director for the Lodge, and the staff, residents, and family members.

20.     Plaintiff was very devoted to and enjoyed her work for Defendant throughout her employment.  She put the residents' and staff's needs ahead of her own.

21.     For example, Plaintiff was dedicated to her work and made herself available at all times if Defendant needed to call her in to work. Plaintiff did not call out of work due to sickness during her employment.

22.     Plaintiff spent the night at the Lodge during bad weather to insure she was present and available for work.

23.     Plaintiff did not even take a full vacation until the end of 2020.

24.     Plaintiff received letters of appreciation for her services from residents and their family members and from the wife of the owner, David Hilliard.

25.     In approximately 2018, Defendant's first Executive Director at the Lodge resigned.  At or around that time, the owner of the Defendant, David Hilliard ("Hilliard"), offered Plaintiff a promotion to the Executive Director/Administrator position.  Plaintiff opted to remain in her position as Director of Nursing. Hilliard, in the presence of the Executive Director who had resigned, also promised Plaintiff that if she stayed with the Defendant, she could work for Defendant until she retired.  Plaintiff did stay as Hilliard requested.

26.     On February 7, 2020, the Virginia Health Commissioner declared Novel Coronavirus (COVID-19) a disease of public health threat.

27.     In early 2020 around the time the COVID-19 pandemic was beginning in Virginia, Defendant's then Executive Director at the Lodge walked off the job.  She took this action in part because Hilliard was not following guidelines established by the CDC.

28.     Hilliard advised Plaintiff that the Executive Director had walked off the job, that he needed a new Executive Director, and he inquired as to Plaintiff's interest in the position.  Hilliard communicated to Plaintiff how much he appreciated her sticking with him.

29.     Because Plaintiff wanted to continue working as Director of Nursing at the Lodge, she declined the offer of the permanent Executive Director position, but she agreed to and did serve in the dual capacities of acting Executive Director and Director of Nursing until a new Executive Director was hired and began working.

30.     In Executive Order No. 51 (effective March 12, 2020), the Governor of the Virginia declared a state of emergency due to COVID-19 and limited in-person meetings and non-essential work gatherings.  This and other Executive Orders addressing COVID-19 were issued pursuant to the authority of Article 7, Section 7 of the Virginia Constitution and Sections 44-146.17 and 44-75.1 of the Code of Virginia.  The State Health Commissioner was authorized to take whatever action was deemed necessary to control the spread of the preventable disease. Executive Order 53, implementing a Temporary Stay at Home Order, became effective March 30, 2020.

31.     Plaintiff performed well in the dual capacities of acting Executive Director and Director of Nursing and began preparing policies and implementing changes in procedures necessary to address the issues presented by the COVID-19 pandemic and the Commonwealth's orders relating to essential businesses such as Defendant's.

32.     In or around April 2020, Defendant hired Maureen Davis ("Davis") as the new Executive Director at the Lodge.  Davis is a female in her mid-thirties.

33.     Davis took over as Executive Director later in the spring of 2020 because she needed to move to Virginia and become licensed as an administrator in Virginia.  As a result, Plaintiff continued to serve in the dual capacities of acting Executive Director and Director of Nursing until Davis finally received her Virginia administrator's license and assumed the Executive Director position in mid-2020.

34.     Plaintiff was able to navigate the challenges of the COVID-19 pandemic in the Lodge well.  She handled, in an appropriate, timely, and professional manner the numerous challenges presented by the pandemic, including as examples dealing with personal protective equipment shortage issues, required social distancing, restrictions on family and other visitors, quarantining residents in their apartments, coordinating changes in healthcare visits and treatments for residents, and otherwise insuring the safety of residents and staff.

35.     While Plaintiff remained Director of Nursing during the COVID-19 pandemic, only one assisted living resident contracted COVID-19.

36.     Plaintiff implemented and insured application of protocols which avoided the devastating outbreaks experienced by other assisted living facilities in Virginia.

37.     Davis reviewed Plaintiff's performance in 2020 and found Plaintiff's performance to be very good such that Plaintiff was entitled to the highest percentage salary increase under Defendant's policies.

38.     The comments to Plaintiff's 2020 performance evaluation performed by Davis stated at the end of the evaluation:

> Teena continues to be an invaluable asset to this community.  Teena balances the need to maintain regulatory compliance with providing excellent customer service.  Likewise, Teena sets clear expectations for her team and consistently holds them accountable for meeting them.  Teena also

demonstrates courteous respect to the other members of the Leadership Team, recognizing the importance of each person's role and how everyone contributes to collaborative goals.  The journey this past year has not been a smooth one to travel, due to the COVID pandemic crisis, yet Teena persevered.  Teena's vigilance kept residents, staff, and family members healthy and safe.  Additionally, Teena maintained excellent traditional clinical outcomes and results.

39.     Given Plaintiff's stellar performance, she also received a $9,000 bonus at the end of 2020.

40.     During 2020 and while the COVID-19 pandemic was still escalating in Virginia, Davis began encouraging after work-hours activities by Defendant's staff, including social gatherings at the pub which is on-site at the Lodge.

41.     These after work activities were not in furtherance of the essential services being offered to the residents at the Lodge and were contraindicated by COVID-19 guidelines from the CDC.

42.     These social activities violated Virginia's orders restricting activities during the COVID-19 pandemic other than those of essential services.  They also violated Defendant's policies or practices implemented during COVID-19.

43.     The staff gatherings at the pub that were facilitated and encouraged by Davis threatened the health and safety of staff and residents given the COVID-19 pandemic.

44.     Davis started celebrating staff birthdays at 4:00 p.m. with happy hour at the pub.  Although Davis never said these after-hours birthday celebrations were mandatory, she later used attendance at the celebrations as a factor in assessing work performance.

45.     Plaintiff does not drink alcohol and her workday, which started at 6:00 a.m., ended before the after-hours pub celebrations started.  Plaintiff objected to the staff

gatherings being held due to COVID-19 and the restrictions on social gatherings.  As a result, Plaintiff did not participate in person at the staff happy hour celebrations.

46.     Prior to the COVID-19 pandemic, Plaintiff did attend off duty events with co-workers, assisted in hosting a company picnic for staff, attended staff Christmas parties, and went to the movies with all department heads.

47.      Rebecca Pierce ("Pierce") is a female licensed practical nurse ("LPN") in her late 20's whom Plaintiff had mentored and promoted to supervise the memory care unit (the "Seasons") of the Lodge in or around 2018 or 2019.

48.     Pierce supervised employees in the Season's unit.  Pierce, in turn, was Plaintiff's subordinate and was supervised by Plaintiff who had overall responsibility over the nursing and care-giver staff.

49.     As of the date of her promotion to supervisor of the Seasons, Pierce had been an LPN for only approximately two years, having earned her LPN license in September 2016. After her promotion, Plaintiff continued to supervise Pierce and maintained regular communications with her.

50.     Pierce exhibited performance issues that Plaintiff had to manage.  For example, Pierce was consistently late for work or meetings, but Plaintiff was fair and evenhanded in her approach to the young subordinate.  Before Davis became Executive Director, Pierce had engaged in gross insubordination directed to the Executive Director and  in front of other managers for which the prior Executive Director intended on terminating Pierce's employment immediately. Plaintiff advocated for Pierce to have another chance.  As a result, the Executive Director gave Pierce a final written notice rather than terminating her employment.

51.     Pierce and Davis were close in age and began socializing together after work hours.  Plaintiff is informed and believes that after Davis became Director, Pierce was able to have the final written notice removed from her file.

52.     Davis also began meeting with Pierce alone and circumvented the chain of command without involving Plaintiff in the meetings.  This resulted in confusion among staff members because Plaintiff was not apprised of all policy changes or resident care changes for which Plaintiff ultimately was responsible.  Davis also caused Pierce to come in overnight for team-building exercises with the overnight crew without including Plaintiff in such meetings.  Defendant was preparing to replace Plaintiff with Pierce.

53.     In the late fall of 2020, Davis approached Plaintiff about changing how tuberculosis ("TB") testing was implemented to insure individuals who were began working at the Lodge met applicable requirements regarding the absence of TB. Davis wanted Plaintiff to perform the TB tests on all Lodge applicants before Defendant offered them jobs at the Lodge.

54.     Plaintiff was concerned about testing applicants before they were employed or offered a job.  Plaintiff contacted a DSS investigator for guidance on the issue and was advised that doing pre-offer TB tests could put Plaintiff's nursing license in jeopardy.

55.     Plaintiff told Davis what the DSS inspector had said and expressed her opinion to Davis that they could not and should not test any applicants before the individuals had been employed and were employees of the Lodge.

56.     Davis became upset over Plaintiff's expression of this opinion, which was well-founded in law.  Plaintiff reasonably believed that testing an applicant for a job in this manner is improper and illegal, and that it would create a potential liability for Defendant.

57.     Further, it violates the ADA to require such a TB test, which is a medical examination, of an applicant before having made a conditional offer of employment.

58.     Davis agreed that the testing could be performed on the day of orientation after hire.

59.     Davis sought to make changes in certain procedures at the Lodge, which Plaintiff implemented, such as "huddle" with staff members daily, weekly staff meetings, and a revised admission process for residents.

60.     Plaintiff did not make any changes that jeopardized or compromised resident safety or well-being.  Despite Davis's non-COVID related changes at the Lodge, Plaintiff continued to insure the safety of the residents and staff.

61.     Plaintiff was responsible for preparing and did prepare new Policies and Procedures for COVID-19, finding ways to get the PPE and other supplies Defendant needed, training staff on the implementation of the new policies, and creating and implementing new methods of communication with health care providers and families of residents.

62.     Due to COVID-19 restrictions and safety precautions, Plaintiff helped serve residents meals in their apartments. She had to do Service Plan reviews over the phone and update them to include COVID-19 response.

63.     Plaintiff was successful in her work during the COVID-19 pandemic and received many communications thanking her for taking such good care of Defendant's staff and residents during the pandemic.

64.     No complaints were lodged against Plaintiff during this time, even with dealing with the challenges and stress of the COVID-19 pandemic.

65.     On or about December 9, 2020, Davis informed Plaintiff that Pierce had been accepted, and would be returning, to school to become a registered nurse, and as a result, Plaintiff had to flex Pierce's hours to allow her to do so.

66.     If Pierce attended school during the day as Davis indicated she would, Pierce would not be able to fulfill her duties as Season and Independent Living Manager. Plaintiff agreed that she would look at the situation when the time arrived and Pierce received her schedule for the coming semester.

67.     At that time, Pierce was the only nursing manager other than Plaintiff at the Lodge. Plaintiff was the only Registered Nurse working at the Lodge.  All of Pierce's nursing manager duties would have fallen on Plaintiff if Pierce were gone during the day when the bulk of the nursing manager duties were required. These duties would have included Service Plan meetings and preparation, admission assessments (Uniform Assessment Instrument), supervision of her units, various treatments, and other duties. Davis directed Plaintiff to "make it happen" so that Pierce could attend classes and keep her nursing position even if she would not be present during the days.

68.     Shortly after this exchange regarding Pierce returning to school, Davis and Pierce both exhibited symptoms of COVID-19 and were forced to quarantine.  Davis and Pierce both tested positive for COVID-19.   For Pierce, it was the third time she was required to quarantine.

69.     Plaintiff assumed full administrative and nursing responsibility over the Lodge during Davis's and Pierce's absences.

70.     In violation of the Defendant's COVID-19 protocol, neither Davis nor Pierce provided their test results which were to be used by Defendant to determine the quarantine period required before their return to work.

71.     Around Christmas of 2020, Davis and Pierce returned to work from their quarantine. Davis returned to work earlier than indicated by COVID-19 policies and protocol. At that time, Plaintiff took her previously scheduled vacation over the Christmas holidays.

72.     Plaintiff returned to work from her vacation on January 1, 2021.

73.      Shortly after Plaintiff's return to work, Davis told Defendant's managers in a managers' meeting about a "sleep-over" she and Pierce had at Davis's home.

74.     Pierce made a strange statement about thinking that she was going to have to sleep naked on the couch at Davis's home.  The entire discussion by Davis and Pierce about the sleep-over was awkward, inappropriate, unprofessional and immature.

75.     Davis met with Plaintiff in early January 2021 after the "sleep-over" meeting occurred and told Plaintiff for the first time that she was not being a "team player." Davis then referred to the "happy hour" parties and celebrations that Plaintiff had not attended.   None of those parties had been mandatory but all of them violated both the COVID-19 guidelines and Defendant's policies.

76.     In addition, Davis used examples of instances which she implied supported her contention that Plaintiff was not being a "team player."  She referred to examples where Plaintiff had sought compliance with laws and regulations governing Defendant's operations and the health and safety of residents and staff.

77.     In one situation, Davis referred to Plaintiff's communication with the dietary manager (a male in his thirties) about his subordinates leaving repeatedly leaving the windows open in the kitchen overnight, which caused the dining room temperature to drop to 60 degrees by the mornings when residents were eating breakfast.

78.     Virginia regulations governing Defendant's operations required that a temperature of at least 72 degrees "shall be maintained in all areas used by residents during hours when residents are normally awake."  See 22VAC40-73-880.B.3.

79.     In another example, Davis referred to Plaintiff's communication with the dietary manager about the state regulation against leaving cleaning solutions or sprays in a location where a resident could access them because such solutions were being left out in an unlocked area by the dining staff and the dietary manager was not properly insuring compliance with the Virginia regulation. See 22VAC40-73-860.  Yet another example referred to Plaintiff's communication concerning a cook's absence and the dietary manager not insuring that a cook was at work for a meal, which violated Virginia regulations governing the requirements for providing residents three well-balanced meals per day, see 22VAC40-73-590, and for scheduling for meals.  See 22VAC40-73-600.

80.     Plaintiff's communications with the dietary manager referred to above, and others like them, had been appropriately directed at insuring compliance with the requirements and regulations to which Defendant and its facility, the Lodge, were subject to insure the health, safety and welfare of the residents.

81.     In addition to the potential jeopardy to Defendant's facility license with the Commonwealth of Virginia licensing department, these situations endangered the health

and well-being of the residents entitled to care that complied with Virginia law and regulations.

82. Plaintiff made Davis aware of the reasons for her communications with the dietary manager and other department heads, and the fact that Plaintiff was objecting to the violations of the applicable Virginia regulations.

83. Davis described to Plaintiff her recent encounter with the dietary manager who had thrown a copy of an email from Plaintiff on one of these issues in Davis's face. Davis directed Plaintiff not to copy her on initial emails, such as those described above, any longer and that she wanted each department head to manage their own department. Davis took no action against the dietary manager for his blatant insubordination or his violations of law and regulations.

84. Davis then told Plaintiff "don't worry about fixing things" and to "just be friends," referring to the department heads.

85. Plaintiff had a good rapport, both personally and professionally, with her co-workers, and other department heads would seek personal and professional advice from her. Nevertheless, Plaintiff was a resident advocate, and it was her duty to ensure residents' needs were being met, especially if the situation involved a violation of regulations enforced by the Virginia Department of Social Services.

86. Because of her position as Director of Nursing, Plaintiff had a statutory obligation to report any incident that may result in abuse or neglect of residents under the care of the Defendant, or to report such conduct to the Executive Director.

87. On January 8, 2021, Davis called Plaintiff to her office and then to the private dining room and told Plaintiff the following words, or words to the effect, that

Davis was "taking the Lodge in a different direction and you're not part of the new vision I have."

88.     Davis further said "I know you are shocked."  She then said that she had "too much respect for [Plaintiff] to do a Corrective Work Plan."

89.     Davis then asked Plaintiff to give a 30-day notice of resignation and instructed Plaintiff not to tell staff (other than Alicia Doyle with whom Plaintiff shared an office), residents, or family members that Plaintiff was leaving.

90.     Plaintiff did not receive any verbal or written disciplinary warnings or write-ups prior to the termination of her employment.

91.     Davis was right that Plaintiff was in shock over the unwarranted adverse action taken by Davis against her.

92.     There was no valid basis for Davis to give Plaintiff a Corrective Work Plan, and Davis mentioned no reason for any such plan.  Plaintiff's performance had been excellent, especially given her performance during the COVID-19 pandemic.

93.     The phrases used by Davis, "new vision" and "taking the Lodge in a different direction," were pretextual and were code phrases for age discrimination.

94.     Plaintiff told Davis at the January 8, 2021 meeting that she was not going to resign, but that she was very surprised and sad.

95.     Davis and Hilliard instructed Plaintiff to tell staff, prospective employers, and the Virginia Employment Commission that she was leaving her employment at Defendant to be closer to her grandchildren.  Davis also told Plaintiff to think about "what you feel you are worth" because Defendant would like to provide a severance package for her.

96.     Plaintiff twice requested Davis to provide her with a termination letter explaining the reason for the termination, which Davis never did.

97.     On the morning of January 11, 2021, Plaintiff asked Davis and Hilliard to let her continue to partner with Defendant into the future by continuing to work there, and in order to do so, Plaintiff asked that they share the "new vision" to which Davis had referred on January 8, 2021.

98.     Davis responded in the afternoon of January 11, 2021, advising Plaintiff that the Defendant was still going to ask Plaintiff to leave.

99.     Davis never provided Plaintiff with a reason for the termination of Plaintiff's employment other than the "new vision" and the "different direction."

100.    Davis also would not share with Plaintiff what the "new vision" was, despite Plaintiff's request.

101.    After the termination Plaintiff learned that the "new vision" involved Defendant replacing Plaintiff with Pierce who was more than 2 decades younger than Plaintiff.

102.    On or about January 11, 2021, Defendant provided Plaintiff with a severance agreement that would have paid her only 8 weeks of pay at her base rate and 40 hours of paid time off, but Plaintiff would have been required to release all claims against the Defendant.

103.    Because Plaintiff rarely took any time off work, she had accumulated paid time off worth approximately $30,000, almost twice the amount Defendant was proposing to pay Plaintiff to get her to release Defendant from liability for, among other things, the

discrimination, retaliation and wrongful discharge claims that are included in this Complaint.

104.    The severance agreement given to Plaintiff by Defendant purported to advise her to consult with a lawyer prior to executing it.  The offer also gave Plaintiff 21 days to consider it before signing.

105.    Davis required Plaintiff to come to the office on the next day, January 12, 2021, to address questions regarding Plaintiff's job duties and where she maintained certain reports in the office.  Plaintiff accommodated Defendant's request.

106.    Prior to this time, Davis had made little or no effort to learn what Plaintiff's job entailed or how she went about doing it.

107.    Plaintiff addressed all questions asked of her and turned in her keys and other company property.

108.    In Plaintiff's presence and the presence of other employees, Davis asked Pierce if she thought she could do Plaintiff's job, and Pierce responded that she would just copy what Plaintiff had done.

109.    The termination of Plaintiff's employment was made effective on January 12, 2021.

110.    Defendant refused to provide Plaintiff with a letter describing any reason for the termination of her employment.

111.    No reason was given to Plaintiff because there was no valid, legal reason or justification for the termination of her employment.

112.    Davis told Plaintiff that she and Defendant wanted Plaintiff to describe the reason for the separation to the Virginia Employment Commission ("VEC") when Plaintiff

applied for unemployment benefits as being that she voluntarily left Defendant's employment to find something closer to home and to spend more time with her grandchildren.  Plaintiff explained that she could not make that statement because it was untrue.  She did not want to leave her employment.

113.    Davis told Plaintiff that if she did not sign the severance agreement, Defendant would contest her claim for unemployment benefits to the fullest extent, although Davis still refused to give Plaintiff a legitimate reason for the termination of her employment.

114.    In reliance on the offer contained in the severance agreement, Plaintiff engaged counsel at her expense to review the severance agreement.  Plaintiff was contacted by email by Davis on January 20, 2021, well prior to the expiration of the 21 days Plaintiff had been given to consider the offer, and after Plaintiff had consulted with an attorney, and was told that Defendant was rescinding its offer contained in the severance agreement.

115.    After Plaintiff's employment with Defendant was terminated, Plaintiff's substantive duties over the nursing staff were assigned to Pierce.

116.    Pierce was in her late 20's and had been Plaintiff's subordinate.  Pierce had only a fraction of Plaintiff's qualifications and experience.  When Pierce was given Plaintiff's position, her title was changed to "Resident Care Director."

117.    Plaintiff's office assistant who was substantially younger than Plaintiff and who was not a nurse and could not perform nursing duties, continued to perform certain of the duties Plaintiff had assigned her, including payroll, scheduling and other ministerial duties.

118.    Because she was not a nurse, the assistant was unable to perform tasks such as taking verbal orders from doctors, preparing Service Plans, doing treatments, administering IM injections or conducting the quarterly oversight for purposes of the DSS.

119.    Following the termination of Plaintiff's employment, Defendant has been cited by the Virginia Department of Social Services for violating regulations involving documentation of medication administration.

<u>COUNT I - Violation of the ADEA - 29 U.S.C. § 623</u>

120.    Plaintiff incorporates by reference and realleges the foregoing paragraphs as if fully set forth here.

121.    At the time of the unlawful termination of Plaintiff's employment, Plaintiff was 55 years old.

122.    Defendant imposed employment policies, practices or procedures on Plaintiff not imposed on her much younger subordinate.  Such differing application of employment policies discriminated against Plaintiff because of age.

123.    Defendant terminated Plaintiff from her employment despite her knowledge, experience, skill, seniority, and satisfactory performance, which exceeded that of the employees under the age of 40, or those substantially younger than Plaintiff, who were retained and given her job duties.

124.    The reasons for the termination of Plaintiff's employment were pretext.

125.    The real reason for the termination of Plaintiff's employment was discriminatory and because of Plaintiff's age and thereby violated her rights to equal employment opportunity as protected by the ADEA.

126.    Plaintiff was subjected to adverse employment action and termination of her employment by Defendant because of her age.

127. Defendant intentionally and willfully discriminated against Plaintiff because of her age.

128. As a consequence of Defendant's intentional discrimination, Plaintiff has lost her job, has lost wages and other financial incidents and benefits of employment, and Plaintiff will continue to suffer such losses into the future.

129. As a consequence of Defendant's intentional age discrimination, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of litigation.

<u>COUNT II - Violation of the ADA</u>

130. Plaintiff incorporates by reference and realleges the foregoing paragraphs as if fully set forth here.

131. Plaintiff opposed Defendant's conduct violative of the ADA, which was in violation of 42 U.S.C. § 12112(d)(1) and (2), including Davis's proposal to have Plaintiff engage in illegal medical examinations of job applicants before conditionally offering positions to them.

132. Defendant terminated Plaintiff's employment in violation of the ADA because she opposed conduct violative of the ADA in violation of 42 U.S.C. § 12112 and 12203.

133. Defendant's conduct was intentional.

134. Defendant engaged in the conduct complained of herein with malice and or reckless indifference to Plaintiff's rights so as to justify an award of punitive damages.

135. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered and will in the future continue to suffer lost wages and benefits, and other damages, and losses otherwise prayed for herein.

COUNT III
(Prohibited Statutory Retaliatory Discharge

Violation of Va. Code § 40.1-27.3)

136.    The foregoing allegations are incorporated as if re-alleged herein.

137.    Virginia Code § 40.1-27.3 (a) (1) makes it unlawful for an employer to discharge, discipline, threaten, discriminate against, or penalize an employee because the employee in good faith reports a violation of any federal or state law or regulation to a supervisor.

138.    Virginia Code § 40.1-27.3 (a)(4) makes it unlawful for an employer to discharge, discipline, threaten, discriminate against, or penalize an employee because the employee refuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason.

139.    Plaintiff refused to allow the Defendant to engage in conduct violative of 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-73-590 and 22-VAC40-73-600. She further made reports of such conduct to Defendant's Executive Director in compliance with Va. Code Ann. § 63.2-1606.

140.    Plaintiff objected to pre-offer TB testing of job applicants, before they were employed or offered employment, which violated the ADA.

141.    Plaintiff communicated with department heads, including the dietary manager and dining room manager close to the end of Plaintiff's employment regarding patient care and well-being issues and violations of Virginia regulations.   These communications were in good faith and addressed incidents that violated state regulations

and jeopardized and would continue to jeopardize resident health, safety, welfare, and well-being if not remedied.  Plaintiff also communicated with her supervisor to advise her of these violations and Plaintiff's instructions that they be addressed.

142.    Defendant, through its Executive Director Davis, instructed Plaintiff not to send such emails and to stop trying to fix things.

143.    Defendant then unlawfully terminated Plaintiff from her employment because of her efforts to require Defendant to comply with law and Virginia regulations, and Plaintiff's good faith reports to her supervisor of Defendant's violation of Virginia regulations, and because she engaged in conduct protected by Va. Code §§ 40.1-27.3, including §§ 40.1-27.3 (a) (1) and (4).

144.    Defendant's conduct was done with malice, and/or reckless indifference to Plaintiff's rights to justify the award of punitive damages.

145.    As a direct and proximate result of the actions of Defendant, Plaintiff has suffered, continues to suffer, and will in the future suffer injury, including but not limited to loss of employment, loss of salary and incentive compensation, loss of benefits, and such other remuneration and damages as are the natural and direct result of Defendant's actions. Plaintiff further has suffered loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court. In addition, she is entitled to injunctive and declaratory relief; reinstatement to the same position she held before the termination, or to an equivalent position, or if reinstatement is not available or would result in hostility, to an award of front pay and benefits.  Plaintiff further is entitled to recover her litigation expenses including her costs, attorney's fees, and expert witness fees pursuant to

Va. Code § 40.1-27.3 (c); and other relief.

COUNT IV

Wrongful Discharge in Violation of Public Policy

Underlying 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-73-590 and 600 and
Authorizing Legislation, Together with Va. Code Ann. § 63.2-1606

146.    The foregoing allegations are incorporated as if re-alleged herein.

147.    Virginia common law provides for a claim for wrongful discharge violating

the public policy underlying such policy pronouncements.  *See Bowman v. State Bank of*

*Keysville, et al.*, 229 Va. 534 (1985).

148.    This claim has been expressly held to include retaliatory discharge in

violation of Virginia public policies underlying statutory enactments to protect health,

safety or welfare.  *See Miller v. SEVAMP*, 234 Va. 463 (1987).  Defendant was an employer

subject to the express mandates of 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-

73-590 and 600 directed at insuring the health, safety and welfare of residents of assisted

living facilities.  These regulations were in turn authorized by Virginia law, including Va.

Code Ann. §§ 63.217, 1732, 1802, 1805 and 1808.

149. The retaliatory discharge remedy provided by Virginia common law is in

addition to any corollary protections provided by statue addressing the same set of

operative facts.  *See Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 105 (1994).

150.    Virginia regulations, including 22VAC40-73-880.B.3, 22VAC40-73-860.I,

22VAC40-73-590 and 600, and their authorizing statutes, evince and are based upon the

public policy in Virginia to protect the health, safety, welfare, dignity, and well-being of

individuals who reside in assisted living facilities licensed by the Commonwealth of

Virginia.

151.    The public policy *underlying* 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-73-590 and 600, and their authorizing statutes forbids the termination of employees for their opposition to conduct which endangers or undermines the health, safety, welfare, dignity, and well-being of such residents.  This includes provision for a common law claim for Plaintiff's assertion of health, welfare, and safety rights and honoring duties provided by these Virginia laws and regulations.

152.    Plaintiff refused to allow the Defendant to engage in conduct violative of 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-73-590 and 600, and acted to protect residents who were subject to Defendant's violations of regulations.

153.    As Director of Nursing, Plaintiff had both a statutory right and a statutory duty to comply with the regulations.  See Va. Code Ann. § 63.2-1606.  Plaintiff made Davis aware of violations of regulations as required by law and she was fired for it.  *See McFarland v. Va. Ret. Servs. of Chesterfield, LLC*, 477 F. Supp. 2d 727 (E.D. Va. 2007).

154.    As Director of Nursing, Plaintiff had both a statutory duty to oppose and prevent Defendant's failure to abide by the applicable regulations.

155.    Plaintiff communicated with certain department heads close to the end of her employment regarding resident health, safety, care and well-being issues and violations of Virginia regulations.  These communications were made in good faith and addressed incidents that violated state regulations and jeopardized and would continue to jeopardize resident health, welfare, safety and well-being if not remedied.   Plaintiff also communicated with her supervisor to advise her of these violations and Plaintiff's instructions that they be addressed.

156.    Defendant terminated Plaintiff's employment because she opposed

Defendant's failure to abide by Virginia regulations and because she engaged in conduct protected by public policies underlying the aforementioned statutes and regulations.

157.     Plaintiff received adverse action, including but not limited to the wrongful discharge of her employment, in violation of the public policy underlying 22VAC40-73-880.B.3, 22VAC40-73-860.I, 22VAC40-73-590 and 600, and their authorizing statutes, including Va. Code Ann. §§ 63.217, 1732, 1802, 1805 and 1808, and underlying Va. Code Ann. § 63.2-1606.

158.     Defendant wrongfully terminated Plaintiff from her employment because of her efforts to require Defendant to comply with Virginia law and regulations, and Plaintiff's good faith reports to her supervisor of Defendant's violation of Virginia regulations.

159.     Defendant engaged in this conduct with malice, ill will and spite, and/or a reckless indifference to Plaintiff's rights justifying an award of punitive damages.

160.     As a direct and proximate result of the actions of Defendant, Plaintiff has suffered, continues to suffer, and will in the future suffer injury, including but not limited to loss of employment, loss of salary and incentive compensation, loss of benefits, and such other remuneration and damages as are the natural and direct result of Defendant's actions. Plaintiff further has suffered loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined by a jury and the Court.

COUNT V
Combination or Intersectional Discrimination

161.     Plaintiff incorporates by reference and realleges the allegations in the foregoing paragraphs as if fully set forth here.

162.    Defendant has intentionally discriminated against Plaintiff in the terms, conditions and privileges of her employment because of her age and/or has retaliated against her for objecting to conduct made unlawful under the ADA, which discrimination and/or retaliation on such bases (or a combination of such bases so as to constitute combination or intersectional discrimination), constituted unlawful employment practices under the ADEA and/or 42 U.S.C. § 12101, *et seq.,* and included the termination of her employment.

163.    As a consequence of Defendant's intentional discrimination and/or retaliation, Plaintiff has suffered, continues to suffer, and will in the future suffer great emotional distress, anxiety, stress, embarrassment, humiliation, pain, suffering, damage to reputation, and loss of enjoyment of life.

164.    As a consequence of Defendant's discriminatory and/or retaliatory actions, Plaintiff has lost her employment, has lost wages and other financial incidents and benefits of employment, and she will continue to suffer such losses in the future.

165.    Plaintiff is further entitled to equitable relief including reinstatement to her supervisory position or to a reasonably comparable position with all benefits of employment restored, or in the alternative for an award of front pay and benefits.

166.    As a consequence of the acts and omissions of Defendant, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses.

167.    Defendant engaged in the discriminatory and/or retaliatory practices complained of with malice or with reckless indifference to Plaintiff's federally protected rights.

168.    Plaintiff is entitled to recover punitive damages in addition to the other damages which she has suffered.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Teena Hall demands judgment against Defendant Piedmont Senior Living Operations, LLC as follows:

(a)     For a declaration that the acts and practices complained of herein are in violation of Plaintiff's rights as secured by the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq.,* and/or the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq*.

(b)     For an order reinstating Plaintiff to her position with Defendant, or in a position with comparable duties and responsibilities and with equal pay and benefits as Plaintiff would have received but for the Defendant's conduct in violation of the ADEA and/or the ADA, and reinstating all benefits to which Plaintiff would have been entitled but for the illegal termination of her employment, or in the alternative for an award of front pay and future benefits in the event reinstatement is impractical or Plaintiff would be subjected to hostility;

(c)     For a permanent injunction enjoining the Defendant from any conduct violating Plaintiff's rights as secured by the ADEA and/or the ADA;

(d)     For an award of back pay, prejudgment interest, and appropriate recovery for lost employment benefits and other affirmative relief as may be appropriate, and for all other wages, benefits or other remuneration denied or lost;

(e)     For an award of liquidated damages under the ADEA;

(f)     For an award of compensatory damages in an amount to be determined by the jury at trial;

(g)     For an award of punitive damages under Counts II through V in an amount to be determined by the jury;

(h)     For an award of reasonable attorneys' fees and costs incurred in this action, together with expert witness fees and expenses;

(i)     For an award in an amount necessary to offset the adverse tax consequences of an award received in a lump sum;

(j)     For an award of pre- and post-judgment interest on any monetary award; and

(k)     For any other relief this Court deems to be just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY pursuant to Fed. R. Civ. P. 38.

TEENA HALL

By:  s/Timothy E. Cupp
Counsel

Timothy E. Cupp, VSB No. 23017
Shelley Cupp Schulte, P.C.
1951 Evelyn Byrd Avenue, Suite D
PO Box 589
Harrisonburg, Virginia 22803
(540) 432-9988
(804) 278-9634 (facsimile)
Email: cupp@scs-work.com

Tim Schulte, VSB No. 41881
Shelley Cupp Schulte, P.C.
3 West Cary Street
Richmond, Virginia 23220
(804)  644-9700
(804) 278-9634 (facsimile)
Email: schulte@scs-work.com
*Counsel for Plaintiff*